U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAKE CHARLES

OCT 1 2 2007

ROBERT H. SHEMWELL, CLERK
BY _____
       DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| DONALD J. MCNEAL | : | DOCKET NO. 05 CV 0791 |
| VERSUS | : | JUDGE TRIMBLE |
| THE KANSAS CITY SOUTHERN RAILWAY COMPANY ET AL | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Presently before the court is Defendants' motion for judgment as a matter of law and alternative motion for a new trial. Plaintiff brought this disparate treatment claim contending that he was terminated due to his race in violation of Title VII. of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.* A jury returned a verdict in favor of Plaintiff. Defendants seek to set aside the jury's verdict pursuant to F.R.C.P. 50(b).

"A post-judgment motion for judgment as a matter of law should only be granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005) (citation and internal quotes omitted). In evaluating the evidence this court must view the evidence and draw all reasonable inferences in the light most favorable to the Plaintiff. *Id.* The issue presented is whether a reasonable jury could find that Plaintiff's race was a motivating factor in Defendant's decision to terminate Plaintiff's employment. Because this case has gone to trial the focus is not on the *McDonnell Douglas* burden-shifting scheme, but instead the focus is simply on whether the record contains sufficient evidence to support the jury's ultimate finding that Plaintiff was terminated, at least in part, because of his race. *Id.* at 475-76.

In general, Plaintiff argues that the jury's finding is supported by evidence: (1) that a similarly situated Caucasian employee was treated differently; and (2) that the reasons given for his termination by Defendant were false. Disparate treatment of a similarly situated employee is one way to demonstrate unlawful discrimination. *Id.* at 478. However, in order to raise an inference of discrimination Plaintiff must show that Defendant gave preferential treatment to another employee under "nearly identical" circumstances. *Id.* This requires Plaintiff to show that the misconduct for which he was discharged was "nearly identical" to that engaged in by the Caucasian employee who was retained. *Okoye v. University of Texas Houston Health Science*, 245 F.3d 507, 514 (5th Cir. 2001); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990). There is no evidence of disparate treatment under "nearly identical" circumstances.

To sustain his burden, Plaintiff points to treatment received by Rob Vail. First, Plaintiff contends that Rob Vail only received a verbal reprimand from Jeff Rogers for admittedly causing a train derailment during his probationary period while Mr. Rogers testified that he would have fired Plaintiff on the spot if he had proof that Plaintiff was the cause of another train derailment. One significant problem for Plaintiff is that it is undisputed that Plaintiff received no discipline whatsoever for the second derailment because others took responsibility for it. Tr. 40-41, 98 & 123. Therefore, this fails to satisfy Plaintiff's burden of showing that he was discharged for conduct "nearly identical" to the conduct of Vail. Furthermore, there are other significant differences involving the two derailments that preclude them from being considered "nearly identical."[1]

---

[1] Two Caucasian employees covered by the collective bargaining agreement took responsibility for the derailment involving McNeal and received 30 day suspensions. Their status as permanent union employees compared to Plaintiff's status as a probationary employee preclude them from being considered "nearly identical" to Plaintiff. *See* Tr. 43.

Vail worked his probationary period in Beaumont, Texas. During his probationary period he was operating a remotely located electronic switch. When Vail activated the electronic switch a train derailed in the yard causing approximately $150 in damages. The electronic switch involved had been malfunctioning. Rogers decided more severe discipline was not called for stating: "but knowing, you know, what I knew about what the switch had been doing, and I had seen it do it myself, I wasn't about to discipline somebody over something that I couldn't prove it wasn't an electrical problem." Tr. 129. The electronic switch was taken out of service for repairs. Subsequent to that a black employee had more problems with the switch and he was not disciplined in any way. Tr. 130.

The circumstances surrounding the Plaintiff's derailment stand in stark contrast. Plaintiff was manning a manual switch. The switch put the train on the wrong track causing it to enter a chemical plant and approximately $29,000 of damage was done. One car almost ruptured which would have required the evacuation of Lamar University. Tr. 121. The circumstances of the two derailments were substantially different. While Rogers indicated that Plaintiff would have been fired had he been responsible Rogers also indicated that he would have fired Vail in the same circumstances. Tr. 130.

Plaintiff argues that the fact that he was terminated for allegedly minor work practices while Vail was merely reprimanded for a derailment would allow the jury to infer discriminatory intent. This argument has no merit. The circumstances were not "nearly identical." *See. Bouie v. Equistar Chemicals LP*, 188 Fed.Appx. 233, 237 (5th Cir. 2006) (White employees engaged in violations allegedly more serious than plaintiff were not engaged in misconduct nearly identical to his.) Plaintiff's reliance on the fact that Vail was not terminated for one instance of insubordination and for the use of a cell phone is also of no avail because the circumstances are

not "nearly identical."[2]

Plaintiff also argues that there is evidence that would allow the jury to reasonably conclude that the legitimate reasons for Plaintiff's termination given by Defendant were false and a pretext for discrimination. Plaintiff was technically fired by J.R. Thronell, the defendant's general superintendent, based on the recommendation of Ed Laughlin, the Leesville trainmaster. Tr. 192-94. Prior to recommending the termination of Plaintiff, Laughlin performed an investigation. Tr. 194. Laughlin's recommendation to Thornell is found at Defendant's Exhibit 38. This recommendation is taken almost verbatim from a letter drafted by Cliff Mount, an assistant train master. This letter states:

> This letter is in reference to Brakeman Trainee Donald McNeal, who is currently working out of the Mossville and Lessville area. I recently had the opportunity to observe Mr. McNeal out in the field working. I observed Mr. McNeal, crossing through cars stepping on pin lifts, drawbars, sliding sills, and then down onto the rail. I also observed Mr. McNeal walking directly behind standing cuts of cars, entering the read zone without setting the red zone up. (Notifying engineer that he would be in between cars working) These are only a few of the things that I observed Mr. McNeal doing. On each of these rule violations, that I observed, I corrected Mr. McNeal, and explained the rule, and the correct way to perform his duties. I also explained that anyone of the rules, in which he had violated, could have cost him his life or one of his limbs. Mr. McNeal seemed to be resentful of the fact that I was correcting him, on his rule violations.

> As per conversations with other managers and peers of Mr. McNeal, I have found him to be unwilling to learn, argumentative, and resentful toward others, when constructive criticism is offered. Although Mr. McNeal has only worked for the K.C.S. for a short period of time, I feel that if he is allowed to become a full time employee of the K.C.S. Railroad, that it would put the company at a huge disadvantage because of it's focus on becoming the safest railroad in North America.

> Due to Mr. McNeal's inability to grasp the concept of railroading, and his

---

[2] It is notable that while Rogers was supervising both Plaintiff and Vail at the time of the derailments each had different supervisors at other pertinent times. *See Wyvill v. United Companies Life Ins. Com.*, 212 F.3d 296, 305 (5th Cir. 2000).

unwillingness to learn and obey the safety rules, I think that it is in the best interest of Mr. McNeal and the K.C.S., that Mr. McNeal's employment be terminated.
Defendant's Exhibit 40.

In addition, Laughlin had a brief conversation with Jeff Rogers, but could not remember if Rogers recommended termination. Tr. 194-95. He also received input from Russell McInnis, another assistant train master, who also recommended termination. Tr. 195. In addition, he talked to two conductors, Allen Villerie and Rob Manuel, and an engineer, Randy Sonnier. Villerie and Sonnier are both black. Tr. 109. Thronell also received input from A.J. Sonnier and Gene Miller, both assistant superintendents. Tr. 194. All recommended Plaintiff's termination.

Villerie testified that both McInnis and Laughlin were fair, honest and treated everyone equally. *Id.* He did not consider Mount to be racist. Tr. 21. Villerie was also assigned to work with Plaintiff as part of his training. Tr. 22. He indicated that when he worked with Plaintiff he found that he would not take his instructions and would not follow orders. Tr. 22-3. He observed Plaintiff about to violate the "red zone rule." Tr. 23 & 27. He found that Plaintiff had an "attitude" when he was corrected. Tr. 24. Villerie conveyed his complaints about Plaintiff to his train master, McInnis. Tr. 25. Villerie was scheduled to work with Plaintiff for five days, but refused to work with Plaintiff after the first two days because Plaintiff would not listen to him. Tr. 30. Plaintiff admitted that Villerie had on one occasion prevented him from improperly going into the red zone. Tr. Vol. 1, p. 60.

Rob Manuel was another conductor that worked with Plaintiff. Tr. 33. On the day they worked together they were building a train, and Plaintiff's job was to line the switches. Plaintiff refused to take instructions or orders from Manuel. Tr. 36. Manuel was trying to kick cars and Plaintiff would "disappear" making it unsafe to release the car. *Id.* Manuel discovered Plaintiff

talking on his cell phone. Tr. 37. This prompted Manuel to complain to the assistant train master, McInnis. Tr. 37-8. Manuel testified that Plaintiff later confronted him and cursed him out for complaining to McInnis. Tr. 39. In response Plaintiff testified that he had talked on his cell phone at work a couple of times, and there was "an issue" about cell phone use, but he does not recall any specific complaints made to him although it was possible. Tr. 145-46. Cell phone records indicate that during Plaintiff's employment in Mossville he made 356 phone calls totaling over 24 hours while at work. Tr. Vol. II, p.11. Plaintiff admits that he was aware that Manuel made a complaint about him, and that he "talked to him about the incident." Tr. Vol. I, p. 63. He denies that he was angry or hostile. Id.

Russel McInnis testified that he had worked with Plaintiff during Plaintiff's probationary period for a total of about 1 ½ months. Tr. 148 & 152. During this time McInnis recalled having to verbally reprimand Plaintiff three to five times. Tr. 152. His testimony substantially corroborated the testimony of Manuel. McInnis saw Plaintiff sitting on a bench talking on a cell phone when he was supposed to be helping Manuel build a train. Tr. 163-4. This required Manuel to do both his job and Plaintiff's job. Id. When McInnis instructed Plaintiff to go line the switch, Plaintiff responded that he knew what he was doing. Tr. 166. It was obvious that Plaintiff resented the instructions. Tr. 167. The assistant train master that worked the shift after McInnis reported that he had the same experience with Plaintiff, and Plaintiff refused to put up his cell phone. Tr. 169. On another occasion McInnis told Plaintiff that he was going to have Plaintiff do an efficiency test to demonstrate that Plaintiff knew how to properly operate a manual interlocker. Tr. 171-72. Plaintiff protested that he knew how to operate the interlock. Tr. 172. When McInnis pointed out mistakes Plaintiff made, Plaintiff responded that he knew what he was doing and that he did not need McInnis "to tell me anything." Tr. 173. Plaintiff did

6

not appear interested in the instructions on the proper operation of the interlocker. Tr. 174. Plaintiff admitted that McInnis had criticized his work in an effort to make him a better switchman. Tr. Vol. I, pp. 140-41

At some point Plaintiff was assigned to work under Cliff Mount in the Leesville yard. McInnis contacted Mount to make sure that he watched Plaintiff closely. Tr. 177. Before Plaintiff arrived in Leesville Laughlin asked Mount to watch Plaintiff's performance and report back to him. Tr. 77. After Mount had worked with Plaintiff he and McInnis discussed their concerns about Plaintiff's performance. Mount verbally reported to Laughlin and Laughlin requested a written report which prompted the letter quoted previously. In the face of this evidence Plaintiff testified that he could not recall stepping on a pin lifter, he was not "insubordinate or argumentative," and had never been called out for stepping in the red zone. Tr. Vol. I, pp. 54, 58, 60.

If the plaintiff both establishes a prima facie case and produces sufficient evidence to find that the employer's legitimate explanation for termination is false, the fact finder may, in some circumstances, reasonably conclude that the termination was motivated by impermissible discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.C.t 2097, 2109 (2000). Here Plaintiff has not presented evidence that would allow a reasonable jury to conclude that a prima facie case was established. In order to establish a prima facie case Plaintiff was required to prove: (1) that he was a member of a protected group, i.e., black; (2) that he was qualified for the job; (3) that he was terminated; and (4) either (a) that he was replaced by a non-black, or (b) that he was treated differently from similarly situated non-black employees. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). Plaintiff has failed to produce evidence that would allow a

reasonable jury to find that the fourth requirement was satisfied. Plaintiff was replaced by a black employee that went on to successfully complete his probationary period. Tr. Vol. II, pp.180-81. In fact, the next two conductors hired at the Mossville yard were black, and both successfully completed their probationary terms to become union employees. Further, as explained previously, Plaintiff has failed to offer evidence tending to show that a similarly situated non-black employee was treated differently from him. Having failed to establish a prima facie case of discrimination, it is at least questionable whether evidence of the falsity of Defendant's explanation standing alone is sufficient to support a jury finding that racial discrimination was a motivating factor in Plaintiff's termination. It is not necessary to resolve this issue.

Even if a plaintiff is able to both establish a prima facie case and offer evidence to support, a finding that the employer's proffered explanation for termination is false this is not always adequate to sustain a jury's finding of intentional discrimination. *Id.* "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Id.*

Here consideration of these factors has led to the conclusion that no reasonable jury could find that Plaintiff's termination was motivated at least in part by intentional racial discrimination. First, as noted, Plaintiff's prima facie case is not only weak it is non-existent. Further, the probative value of Plaintiff's evidence that Defendant's explanation for Plaintiff's termination was false is weak at best. Several employees who worked with Plaintiff, both black and white, testified that Plaintiff failed to follow instructions and appeared to respond poorly when corrected. In response Plaintiff tendered a general denial that he was "insubordinate or

8

argumentative." Two co-workers testified about Plaintiff's neglect of his duties while talking on his cell phone. This was corroborated by phone records showing substantial cell phone usage while on the job. In response Plaintiff testified that he did not recall any complaints about his cell phone usage and suggested that he talked on his phone on only a couple of occasions while on the job. Plaintiff did acknowledge that McInnis had criticized his work. Tr. Vol. I, p. 140. Several employees expressed concerns about Plaintiff's lack of attention to safety and gave examples of him improperly entering the "red zone" and stepping on a pin lifter. Plaintiff could not recall stepping on a pin lifter and denied that anyone told him that he had. He admitted that Villerie had to stop him from entering the "red zone" on one occasion, but denied being called out for actually improperly entering the "red zone." In essence, Plaintiff is primarily disputing Defendant's assessment of his performance. This is not sufficient to support a finding that Defendant's reasons were pretext for discrimination. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

Other circumstances further undermine Plaintiff's case. Plaintiff admitted that until he was fired there was nothing to suggest any discrimination based on his race. Tr. Vol. I, p. 126. It is clear that Plaintiff was terminated based on the recommendation of Laughlin. Laughlin's recommendation was based, in turn, on information he gathered from a number of subordinates. There is absolutely no evidence that would allow a reasonable jury to conclude that Laughlin had any discriminatory motive in recommending the termination. Further, the fact that he gathered his information from several sources, including two black employees, and that the information was consistent minimizes the likelihood that discriminatory animus had infected the flow of

9

information to Laughlin[3]. *See Strong v. University HealthCare System, L.L.C.*, 482 F.3d 802, 806 n.2 (5th Cir. 2007) (Collective decision-making is less susceptible to influence by an individual with improper motive.).[4]

Plaintiff argues that other circumstances suggest that discrimination was a motivating factor in his termination. He points to the lack of documentation of reprimands or warnings. However, the evidence was clear and uncontroverted that probationary employees were generally not given written reprimands. Those few instances where there was written documentation of discipline of probationary employees were easily explained. For example, there was documentation related to the derailment involving Mr. Vail. This was due to the fact that derailments prompt an investigation with a written report. Plaintiff also suggests that the fact that his file was documented with a report from Mount, the fact that Mount's conclusion that Plaintiff resented correction was based on Plaintiff's body language, and the fact that Plaintiff was not terminated sooner suggest discrimination. Plaintiff also points to evidence that evaluations early in his training were changed. *See* Plaintiff's Exhibit 7. Of course, subsequently Plaintiff was "marked up" as a probationary conductor, and Defendant never suggested that these evaluations contributed to the decision to terminate Plaintiff. Stretching logic even further, Plaintiff argues that he presented evidence that in an unrelated incident Defendant terminated a

---

[3] In some circumstances the decisionmaker can "inherit" a discriminatory taint. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000).

[4] Plaintiff contends that Defendant is barred from arguing "collective decision making" or "Plaintiff's failure to show discriminatory animus" because these arguments were not raised in the pre-verdict motions for JMOL. This contention is unfounded. During argument on the motion for JMOL counsel for Plaintiff indicated that he was relying solely on the disparate treatment received by Mr. Vail and Plaintiff in order to prove discrimination. Tr. Vol. II, p. 219. That being the case it is not surprising that counsel for Defendant focused on this issue in arguing the motion. However, it was always clear that Defendant was seeking a JMOL based on the lack of evidence of intentional discrimination. It urges the same in the present motion.

white employee and gave a false reason for the termination. From this Plaintiff claims that a reasonable jury could conclude that the reasons given by Defendant for Plaintiff's termination were false and that the real reason was his race. The principle problem with these arguments is that none of them suggests any nexus to discrimination.

In short, the thread of evidence relied upon by Plaintiff is far too thin to support the weight of his claim that he was fired, at least in part, because of his race. Based on the evidence of record a rational jury could not find that the Plaintiff's race was a motivating factor in Defendant's decision to terminate the Plaintiff. Accordingly, the motion for judgment as a matter of law is granted. The judgment in favor of plaintiff is set aside, and judgment in favor of Defendant will be entered. Within 10 calendar days of this date counsel for Defendant will prepare a judgment consistent with this memorandum ruling, have it approved as to form by opposing counsel and submit it to the undersigned for signature.[5]

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 12th day of October, 2007.

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE

---

[5] The alternative motion for a new trial is conditionally denied. Admission of evidence relative to Mr. Vail was not "inconsistent with substantial justice." *See* F.R.C.P. 50(c)(1).